IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRENT V. BOYD　　　　　　　　　　*
　　　　　　　　　　　　　　　　　　*
　　v.　　　　　　　　　　　　　　*　　Civil No. JFM-10-0360
　　　　　　　　　　　　　　　　　　*
BERT BELL/PETE ROZELLE　　　　　*
NFL PLAYER RETIREMENT PLAN　　　*
　　　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　******

MEMORANDUM

Plaintiff Brent Boyd ("Boyd") has brought this action against Defendant Bert Bell/Pete Rozelle NFL Player Retirement Plan ("the Plan"), which is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Boyd seeks judicial review of the Plan's refusal to reclassify his disability benefits. The parties have filed cross-motions for summary judgment. The issues have been fully briefed, and no hearing is necessary. *See* Local Rule 105.6. Defendant's Motion for Summary Judgment will be granted, and Plaintiff's Motion will be denied.[1]

I.

From 1980 to 1986, Boyd, an offensive lineman, played professional football with the Minnesota Vikings of the National Football League ("NFL"). He retired from football prior to the 1987 season. Boyd alleges that in August 1980, during a game against the Miami Dolphins, he was rendered unconscious by a blow to the head. He claims he experienced blindness in his

---

[1] The Plan seeks leave to file a surreply. A party will be permitted to file a surreply when it otherwise "would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (citation omitted). Defendant has had an adequate opportunity in its earlier briefings to address the matters it wishes to discuss in the surreply, the applicability of the doctrine of res judicata and the proper interpretation of "changed circumstances" as used in the Plan. Plaintiff's Reply merely responds to Defendant's prior arguments and does not introduce new issues. Accordingly, the Motion for Leave to File Surreply will be denied.

1

right eye for several minutes after the blow, but he soon reentered the game. According to Boyd, because he regained his vision and appeared to have no lingering effects, Vikings medical staff opted not to send him for further evaluation. (Admin. R., Ex. 45, Boyd Application for Disability Benefits (June 1, 2000) ("2000 Benefits Application"), at BVB0135–36.) Boyd reports that following this event he began to experience headaches, fatigue, and difficulty with concentration and memory. (*Id.* at BVB0136–37.) Although this was the only incident in which Boyd recalls losing consciousness while playing football, he states that on other occasions during his NFL career he incurred hits after which "he was dazed." (Admin. R., Ex. 131, Letter from Dr. Ronald Ruff to Barbara Casino (Nov. 1, 2002), at BVB0727.) When he retired, Vikings medical staff declined his request for a brain scan during his exit physical. (2000 Benefits Application, at BVB0136.) Hence, no contemporaneous medical records substantiate Boyd's assertions regarding the 1980 head injury or the subsequent symptoms.

The parties agree that Boyd's NFL career qualifies him as a "Vested Inactive Player" entitled to disability benefits under the Plan. The Plan provides two types of benefits for Vested Inactive Players who suffer total and permanent ("T&P") disabilities: "Inactive" T&P benefits and "Football Degenerative" T&P benefits. (Admin. R., Ex. 278, Bert Bell/Pete Rozelle NFL Retirement Plan (Amended & Restated as of Apr. 1, 2009) ("Plan") § 5.1.) Whereas "Inactive" benefits are available to any Vested Inactive Player who suffers a T&P disability (*Id.* § 5.1(d)), "Football Degenerative" benefits, which provide greater monthly payments, require that "the disability[] arise[] out of League football activities." (*Id.* § 5.1(c).) Initial determinations regarding applications for benefits are made by either the Disability Initial Claims Committee ("the Committee") or the Retirement Board ("the Board"). (*Id.* § 5.5(a).) Applicants may appeal

adverse decisions to the Board, which serves as the administrator of the Plan. (*Id.* §§ 8.2, 11.6(a).)

Boyd first applied for disability benefits from the Plan in 1997 based on a knee injury he suffered during a Vikings practice. (Admin. R., Ex. 11, Boyd Application for Disability Benefits (Mar. 9, 1997), at BVB0030–31.) This application was denied because the Board concluded this injury did not prevent him from working. (Admin. R., Ex. 16, Retirement Board Meeting Minutes (Apr. 24, 1997), at BVB0056.) In June 2000, Boyd submitted a new application, asserting that he was disabled as a result of headaches, depression, attention deficit disorder, and other symptoms that Boyd claimed were caused by a head injury he sustained while playing football. (Admin. R., Ex. 45, Application for Disability Benefits (June 1, 2000), at BVB0137–38.) In support of his application, Boyd provided the following materials: (1) a letter from Dr. Dennis Alters, Boyd's treating physician; (2) a letter from Suzanne O'Neal, a licensed marriage and family therapist who treated Boyd; and (3) reports from Drs. Edward Spencer and Daniel Amen, psychiatrists, of the Amen Clinic for Behavioral Medicine. In their letters, Dr. Alters and O'Neal opined that Boyd's symptoms were the result of head trauma he suffered while playing professional football. (Admin. R., Ex. 44, Letter from Suzanne O'Neal (June 1, 2000), at BVB0132; Ex. 46, Letter from Dr. Dennis Alters to Barry Axelrod (June 2, 2000), at BVB0143.) Dr. Spencer's and Dr. Amen's reports stated that single-photon emission computerized tomography ("SPECT") scans of Boyd's brain showed several areas of abnormal activity. Based on these scans, both doctors concluded Boyd suffered head trauma, which had caused attention deficit disorder, depression, and post-concussion syndrome. (Admin. R., Ex. 38, Report of Dr. David Amen, at BVB0093; Ex. 41, Letter from Dr. Edward Spencer to Barry Axilrod [*sic*] (May

3

26, 2000), at BVB0106–07; Ex. 42, Adult Evaluation Report by Jonathan Halverstadt & Dr. Edward Spencer, at BVB0114–15.)

After obtaining reports from two neutral physicians—Dr. Branko Radisavljevic, psychiatrist, and Dr. J. Sterling Ford, neurologist—concurring in the view that Boyd was permanently disabled as a result of a brain injury caused by football-related activities (*see* Admin. R. Ex. 48, Physician's Report by Dr. J. Sterling Ford (June 5, 2000), at BVB0146–47; Ex. 57, Physician's Report by Dr. Branko Radisavljevic (Sept. 15, 2000), at BVB0173–74), the Board voted to award Boyd Inactive T&P benefits (Admin. R., Ex. 65, Letter from Sarah Gaunt to Barry Axelrod (Jan. 3, 2001), at BVB0209). Before deciding whether to award Football Degenerative benefits, however, the Board sought an additional evaluation by a neutral neurologist. (Admin. R., Ex. 71, Retirement Board Meeting Minutes (Jan. 11, 2001), at BVB0228.) The Plan referred Boyd to Dr. Barry Gordon at the Johns Hopkins Hospital. (Admin. R., Ex. 75, Letter from Sarah Gaunt to Barry Axelrod (Mar. 5, 2001), at BVB0275.) After two days of examination and neuropsychologic testing, Dr. Gordon concluded, "[T]he alleged head injury of August, 1980 could not be organically responsible for all or even a major portion of the neurologic and/or neuropsychologic problems that Mr. Boyd is experiencing now, to a reasonable degree of medical probability." Dr. Gordon surmised Boyd's disability instead was the result of chronic pain, depression, hypertension, or physical deconditioning. (Admin. R., Ex. 87, Letter from Dr. Barry Gordon to Sarah E. Gaunt (Apr. 6, 2001), at BVB0463.) The Board then denied Boyd's request for Football Degenerative T&P benefits because it determined that Dr. Gordon's findings "establish[ed] that Mr. Boyd's disabilities do not arise out of League football activities." (Admin. R., Ex. 99, Letter from Sarah Gaunt to Barry Axelrod (Apr. 30, 2001), at BVB0608.) After Boyd sought judicial review, both the United States District Court

for the Southern District of California and the Ninth Circuit found the Board did not abuse its discretion in concluding Boyd's disability was not caused by professional football activities and denying Football Degenerative benefits. *See Boyd v. Bert Belle/Pete Rozelle NFL Players Ret. Plan*, 410 F.3d 1173 (9th Cir. 2005).

In 2008, Boyd requested reclassification of his T&P benefits from Inactive to Football Degenerative. (Admin. R., Ex. 208, Letter from Mark DeBofsky to Sarah Gaunt (July 10, 2008), at BVB0915.) Under Section 5.5(b) of the Plan, reclassification is permitted if a player presents "clear and convincing" evidence "that, because of changed circumstances, the Player satisfies the conditions of eligibility" for a different category of benefits. (Plan § 5.5(b).) Boyd's attorney argued that reclassification was warranted not only because Boyd was "improperly denied" Football Degenerative benefits in 2001, but also because a number of new events had occurred since 2003 establishing that Boyd's disability was, in fact, caused by a head injury incurred while he was playing NFL football. (Admin. R., Ex. 231, Letter from Mark DeBofsky to Alvara Anillos (Nov. 25, 2008), at BVB0962–64.) First, Dr. Radisavljevic reexamined Boyd in 2005 and reiterated his view that Boyd's injury was caused by football. Second, the Social Security Administration ("SSA") found Boyd to be disabled as a result of head trauma. A physician conducting an independent evaluation for the SSA "concluded that Mr. Boyd's 'presentation would be consistent with Depressive Disorder . . . and Cognitive Disorder . . . due to cognitive losses <u>secondary to multiple concussions.</u>'" (*Id.* at BVB0964–66 (emphasis in original).) Third, a number of new health care providers, including Ted Young, clinical neuropsychologist; Melissa Bloch, neurologist; Gerard Hershewe, neurologist and neuro-ophthalmologist; and Donald Farrimond, family practitioner, examined Boyd and determined his condition was caused by post-concussion syndrome or traumatic brain injury. Finally, Dr. Amen compared the SPECT

5

scan performed in 2000 with a scan performed in 2008 and found the changes to be consistent with "cognitive impairment" and "distinct brain trauma." (*Id.* at BVB0965.)

The Committee considered Boyd's application and, in December 2008, denied his request for reclassification because Boyd failed to establish changed circumstances:

> The Committee regrets that it was forced to conclude that you have presented absolutely no evidence of any "changed circumstances," and that there are no "changed circumstances" here. All you have done is reargue the causation of the original circumstances. The Committee found, in other words, that Mr. Boyd remains unable to work for the same reasons as before, and he has no changed circumstances.

(Admin. R., Ex. 238, Letter from Paul Scott to Mark Debofsky (Dec. 22, 2008), at BVB0988.) Boyd appealed (Admin. R., Ex. 245, Letter from Mark Debofsky to Alvara Anillo (Mar. 27, 2009), at BVB0997), but the Board tabled the appeal at two subsequent meetings for further medical evaluation. (Admin. R., Ex. 265, Retirement Board Meeting Minutes (Nov. 18–19, 2009), at BVB1031; Ex. 270, Letter from Sarah Gaunt to Brent Boyd (Mar. 2, 2010), at BVB1047.) Boyd, however, refused to undergo additional evaluations, and he filed the present action on February 16, 2010. The Board denied Boyd's appeal on May 13, 2010, citing two reasons. First, it noted Boyd's refusal to undergo the requested medical examination violated the terms of the Plan. (Admin. R., Ex. 272, Letter from Sarah Gaunt to Mark Debofsky (May 20, 2010) ("Reclassification Denial Letter"), at BVB1072–73.) Second, the Board concurred with the Committee that there had been no changed circumstances. The letter informing Boyd of the decision explained:

> [T]he Retirement Board determined that Mr. Boyd's request for reclassification involves the same circumstances as the initial classification of his T&P benefits. In both proceedings, Mr. Boyd has attempted to establish that his cognitive impairments are the consequence of a head trauma he experienced while playing NFL football. Indeed, Mr. Boyd even submitted reports from the same

6

> medical source—Dr. Amen—in both proceedings to establish the same proposition: that Mr. Boyd has decreased brain function consistent with head trauma. The other evidence you have submitted addresses essentially the same point . . . . The Retirement Board concluded that Mr. Boyd has presented no evidence of changed circumstances, and has instead provided additional data and argument on the original circumstances.

(*Id.* at BVB1072.)

II.

A.

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court of the United States explained that in considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In analyzing whether a genuine issue of material fact exists, the evidence and reasonable inferences from that evidence must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

B.

When reviewing a denial of benefits under an ERISA-governed plan, a district court must first determine "whether the relevant plan documents confer discretionary authority on the plan administrator." *DuPerry v. Life Ins. Co of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011). Here, the plan documents bestow upon the Board "full and absolute discretion . . . to interpret, control, implement, and manage the Plan and the Trust," including "the power to . . . [d]efine the terms of

7

the Plan and Trust." (Plan § 8.2.) Because "[the] ERISA benefit plan vests with the plan administrator the discretionary authority," the administrator's contested decision is subject to review only for abuse of discretion. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010) (citations omitted). In the ERISA context, "the [abuse-of-discretion] standard equates to reasonableness: [A court] will not disturb an ERISA administrator's discretionary decision if it is reasonable." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (citations omitted). "At its immovable core," the abuse-of-discretion standard requires that a court "not reverse merely because it would have come to a different result in the first instance." *Id.* Thus, here, to be upheld, the Board's decision need only be "'the result of a deliberate, principled reasoning process and . . . supported by substantial evidence.'" *Id.* (quoting *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995)). In deciding whether these requirements have been satisfied, the court should examine only "the evidence that was before the plan administrator at the time of the decision." *Bernstein*, 70 F.3d at 788 (citation omitted).

Among the factors the Fourth Circuit has instructed courts to consider in determining whether an administrator has abused its discretion is the administrator's "motives and any conflict of interest it may have." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000). In *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008), the Supreme Court clarified the role that this factor should play in the court's analysis. The existence of a conflict does not alter the standard of review the court employs; rather, it is "but one factor among many" that a court should consider in evaluating the administrator's decision. *See id.* at 116. Once a conflict of interest has been identified, "the

8

circumstances of the particular case" determine "the significance of the factor" to the court's review of the decision. *Id.* at 108.

Boyd contends that I should find the Board to be conflicted and should consider this conflict in analyzing the reasonableness of the Board's decision. The basis of this conflict, Boyd argues, is the composition of the Board, which is made up of three members appointed by the NFL Players' Association, the players' union, and three members appointed by the NFL Management Council, the association of clubs. (*See* Plan § 8.1.) The clubs fund the trust out of which Plan benefits are paid, and their contributions are based on actuarially determined need. (*See id.* § 3.1.) In 2010, the Plan was found to be underfunded. (Admin. R., Ex. 282, Letter from Sarah Gaunt to Plan Participants (July 22, 2010), at BVB001613.) According to Boyd, these facts demonstrate that, at minimum, members appointed by the Management Council have a financial conflict of interest. Boyd further argues that these members are also conflicted because, historically, the NFL publically denied a causal connection between football and permanent brain injuries, so the NFL's representatives on the Board have an incentive to deny that disabilities such as his are caused by head trauma incurred while playing football in order to maintain the NFL's public image.

The Supreme Court has found a conflict of interest to exist where the same entity that pays benefits also administers the plan, giving the administrator "a direct financial stake in eligibility determinations." *Parsons v. Power Mountain Coal Co.*, 604 F.3d 177, 184 (4th Cir. 2010); *see, e.g.*, *Glenn*, 554 U.S. at 108. Circuits who have considered the issue after *Glenn* are divided as to whether a conflict should be found where, as here, the entity acting as the administrator of the plan is made up equally of representatives of the employees, who receive benefits from the plan, and the employer, who funds the plan. The Ninth and Sixth Circuits

determined that such a structure did not present a conflict.  *See Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.*, 588 F.3d 641, 648 (9th Cir. 2009); *Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan*, 346 F. App'x 1, 5 (6th Cir. 2009) (unpublished).  The Second Circuit, in contrast, concluded that this structure did pose a conflict, and the presence of employee representatives should be considered in determining the "'*significance* or *severity*'"— not the existence—of the conflict.  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138–39 (2d Cir. 2010) (emphasis in original).

In this District, two post-*Glenn* courts have held that the Board is not conflicted by virtue of its composition.  *See, e.g.*, *Stewart v. Bert Bell/Pete Rozelle NFL Retirement Plan*, 1:09-cv-02612-WDQ (D. Md. Jan. 13, 2011); *Sagapolutele v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 1:08-cv-01870-WMN (D. Md. Oct. 22, 2008).  I find the reasoning of these cases to be persuasive, and I too hold that the Board does not suffer from a conflict of interest.  *Cf. Sagapolutele*, No. 1:08-cv-01870-WMN, slip op. at 5–6 (stating that any alleged conflict of three Board members could not be imported to the entire Board because a majority vote was required for benefit determinations).[2]

### III.

Before reaching the merits of the present case, I must consider the Plan's argument that, because the Plan prevailed in Boyd's earlier action in the Ninth Circuit, the doctrines of res judicata and collateral estoppel defeat Boyd's claim.  "[U]nder the doctrine of res judicata, a

---

[2] Moreover, even I were to follow the Second Circuit and find that a conflict existed, other structural protections provided by the Plan—for instance, the presence of equal union representatives, the use of a trust rather than direct payments by the NFL, and the Board's reliance on independent physicians in making benefit determinations—would drastically diminish the significance of this factor in my analysis.  *Cf. Glenn*, 554 U.S. at 117 ("[A conflict] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy.").

judgment 'on the merits' in a prior suit involving the same parties . . . bars a second suit based on the same cause of action." *Lawlor v. Nat'l Screen Svc. Corp.*, 349 U.S. 322, 326, 75 S. Ct. 865 (1955). Res judicata is inapplicable here, however, because Boyd is not asserting the same cause of action: He claims the Board abused its discretion in failing to reclassify his benefits, not in awarding him Inactive T&P benefits as an initial matter. Because this cause of action did not arise until after the previous case was resolved, the prior judgment cannot preclude it. *See id.* at 328 ("While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist."). Moreover, the Fourth Circuit has recognized that a new claim for benefits based upon changed circumstances is not barred by an earlier denial as a matter of res judicata because "[t]he health of a human being is not susceptible to once-in-a-lifetime adjudication." *Lisa Lee Mines v. Dir., Office of Workers' Comp. Programs*, 86 F.3d 1358, 1362 (4th Cir. 1996) (en banc).[3]

Collateral estoppel "precludes relitigation of issues actually litigated and determined in the prior suit." *Id.* at 326. Defendant contends that Boyd cannot now argue that head trauma experienced during football caused his disability because the Plan prevailed on this issue in the Southern District of California and the Ninth Circuit. The prior action, however, merely determined that the Board did not abuse its discretion in denying Boyd's benefits on the evidence in the administrative record at that time. The district and circuit courts, properly adopting a deferential standard of review, did not actually decide whether Boyd's disability was or was not

---

[3] The Plan contends that I should not rely upon this precedent in the present action because the Fourth Circuit in *Lisa Lee Mines* was considering a claim for benefits under the Black Lung Benefits Act ("BLBA"), not a plan subject to ERISA. In other ERISA cases, however, the Fourth Circuit has looked to BLBA jurisprudence as persuasive authority. *See, e.g.*, *Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 209 F. App'x 305, 314–15 (4th Cir. 2006) (relying on cases involving social security and the BLBA to support the conclusion that an administrator of an ERISA-governed plan abuses its discretion in failing to follow unanimous evidence).

caused by football-related head trauma, nor did they determine the meaning of the term "changed circumstances" as used in the Plan, as the term was not then at issue. Because the dispositive issues in the present action were not actually litigated or determined in the earlier suit, Boyd is not barred from arguing that the Board abused its discretion in failing to reclassify his benefits on the basis of changed circumstances established by the new evidence he submitted.

IV.

The Board denied Boyd's request for reclassification because it concluded that he failed to present "clear and convincing evidence" of "changed circumstances." The letter explaining the grounds for the denial made clear that the Board had interpreted "changed circumstances" to require, in the context of the Plan, a change in physical condition, not merely the availability of new evidence regarding causation. For instance, the Board "noted that Mr. Boyd's reclassification claim [was] based on cognitive impairments allegedly caused by head trauma, exactly as before," and it rejected Boyd's reclassification request as "an effort to reopen and relitigate the Retirement Board's 2001 determinations about the causation of his cognitive impairment." (Reclassification Denial Letter, at BVB1072.) Boyd contends that the Board's interpretation of this term is unreasonable and, therefore, an abuse of discretion.

"Where a plan administrator has offered a reasonable interpretation of disputed provisions, [a court] may not replace it with an interpretation of [its] own." *Booth*, 201 F.3d at 344. To be reasonable, the administrator's interpretation must "adhere both to the text of ERISA and the plan." *Evans*, 514 F.3d at 322. An interpretation will constitute an abuse of discretion if it "is contrary to the clear language of the plan." *Lockhart v. United Mine Workers of Am. 1974 Pension Trust*, 5 F.3d 74, 78 (4th Cir. 1993) (internal quotation marks and citations omitted).

Boyd argues that the Board should be required to interpret "changed circumstances" in the same manner that the Fourth Circuit defines the phrase "material change in condition," as it appears in a duplicate-claims regulation promulgated under the Black Lung Benefits Act. Under this approach, to prevail, a claimant need only prove at least one of the elements previously adjudicated against him. *See Lisa Lee Mines*, 86 F.3d at 1362–63. The Fourth Circuit, however, adopted this approach because it had been selected by the Director of the Office of Workers' Compensation Programs, and the court owed deference to the Director's reasonable interpretation of the regulation.[4] *See id.* at 1362–63 & n.2; *see also Lovilia Coal Co. v. Harvey*, 109 F.3d 445, 454 (8th Cir. 1997) ("Because we find that the Director's interpretation . . . is reasonable, we join the Third, Fourth and Sixth Circuits in adopting the Director's one-element standard."); *Sharondale Corp. v. Ross*, 42 F.3d 993 (6th Cir. 1994) ("We may not substitute our own construction of the regulation for the Director's unless his is unreasonable."). In selecting this approach, the Third Circuit noted, however, that the Director's chosen interpretation was not the only reasonable one: It acknowledged that a narrower interpretation articulated by the Seventh Circuit would have been permissible had the Director chosen to adopt it. *See Labelle Processing Co. v. Sparrow*, 72 F.3d 308, 317 (3d Cir. 1995).

Here, the entity to which deference is owed—the Board—has adopted a different, yet reasonable, interpretation. The Board's interpretation does not violate the ordinary meaning of

---

[4] Notably, the Fourth Circuit's deference to the Director's interpretation of "material change in circumstances" differentiates this portion of *Lisa Lee Mines* from the court's determination in that case that a claim for benefits based upon changed circumstances is not barred by an earlier denial as a matter of res judicata. The discussion of res judicata rested upon general principles of the doctrine and therefore its reasoning is equally applicable in the present action. In contrast, the interpretation of "material change in circumstances" involved the construction of a regulation and turned upon the reasonableness of the regulator's chosen interpretation. Of course, no deference is owed to the Director's interpretation of that regulation in determining the appropriate interpretation of the Plan terms at issue here, so, on this issue, Boyd's reliance on *Lisa Lee Mines* is unavailing.

the term "changed circumstances," and it is not contrary to any other provision in the Plan. In addition, Boyd has not shown that, in the past, the Board construed "changed circumstances" in a different manner. Accordingly, the Board did not abuse its discretion in interpreting the terms of the Plan. *See Lockhart*, 5 F.3d at 78–80.

Once "changed circumstances" is interpreted in this manner, it is evident that the Board's decision to deny Boyd's claim for reclassification was supported by substantial evidence. The Board accurately noted that Boyd's new evidence focused only on the issue of causation of his existing disability, not on proving that a distinct, football-related injury had caused him to be totally disabled.[5] In fact, Boyd's evidence indicated that his physical condition had not changed since his prior application. (*See* Admin. R., Ex. 160, Report of Dr. Branko Radisavljevic (June 24, 2005), at BVB0825 ("Since my last report the patient's situation did not change significantly . . . . Mr. Boyd does not offer any new complaints or does not offer that there has been any change in his condition.").) Therefore, the Board did not abuse its discretion when interpreting or applying the Plan's terms.[6]

For the foregoing reasons, judgment will be entered in favor of Defendant.

May 24, 2011            /s/
Date            J. Frederick Motz
           United States District Judge

---

[5] Boyd also argues that "changed circumstances" are present because the NFL has increasingly acknowledged the causal link between football and long-term brain damage. It would be inappropriate for me to consider this argument because the supporting evidence he submitted did not appear on the administrative record. In addition, this would not constitute a change in circumstances under the reasonable interpretation adopted by the Board.

[6] Because I find that the Board's denial did not constitute abuse of discretion, I will not consider the Board's contention that Boyd's claim must fail because he refused to undergo a medical examination while his appeal was pending.